Case number 23-3999, 23-4000, 23-4001, Roger Gillispie v. Miami Township OH at all. Arguments not to exceed 15 minutes per side. Mr. Cox, you may proceed. Good morning, your honors. My name is Jeff Cox. I'm joined by my colleague Melinda Burton here today on behalf of Miami Township. May it please the court, we will reserve one minute for rebuttal time at the conclusion of the other presentations. The procedural history of this case has been detailed in the appellate briefs. The several appellate issues presented by Miami Township derived from a jury decision in December 2022 that determined that the lone defendant, Officer Scott Moore, committed multiple federal civil rights violations of 42 U.S.C. section 1983. However, the jury acted unreasonably and inconsistent with the evidence presented and contrary to the controlling federal law when answering interrogatories that Mr. Moore's actions were in good faith and within the scope of his employment and official responsibilities. As Miami Township argued in its Rule 50 motion and argues again here on appeal, Mr. Moore's conduct in the investigation and the arrest and in aid of prosecution of Mr. Gillispie was not in good faith and was behavior outside of the scope of his employment and his official responsibilities. A reasonable jury could not have found otherwise. Under controlling federal civil rights law of this circuit, the Moldawan case, there was an insufficient evidentiary basis for the jury to find Moore acted in good faith or within the scope of his employment. What did he do wrong? Well, he withheld exculpatory evidence, he introduced fabricated evidence, he knowingly made false statements, and he employed unnecessarily suggestive identification procedures, particularly with regard to the photo lineup. In sum, Mr. Moore violated clearly established constitutional and statutory rights. The jury concluded that Mr. Moore did, indeed, knowingly and recklessly violate, knowingly or recklessly, excuse me, violate Mr. Gillispie's due process rights. The district court determined that those actions were reckless and not knowing. The records replete with evidence that Mr. Moore's 1983 violations were intentional and not merely reckless. Moore's testimony made plain that he knowingly acted and made conscious choices in acting outside of his official duties. For instance was, and we note this at page 20 of our brief, that he was observed to be lying to the jury, to the grand jury, about campground registration cards, and which he characterized as a play on words. Moore's actions were not merely mistakes, but rather very consequential and intentional deprivations of Mr. Gillispie's constitutional protections. Mr. Moore had an unwavering constitutional duty, and the district court understood this set of obligations when earlier in the case it denied Mr. Moore's request for qualified immunity. And yet, the district court chose to ignore Moldavan, controlling federal civil rights law, when addressing the predicates for Miami Township's indemnification obligations under Ohio Revised Code 274407. And that is error. Miami Township, consequently, is entitled to a declaration that it was not required to indemnify Mr. Moore. When the indemnification of an employee by a political subdivision is based on a violation of federal law, Section 1983, federal law that holds that certain actions can never be done in good faith, must control. If the court is going to allow state law indemnity to apply to the Section 1983 claim here, then interpreting the Ohio statute to accord with federal law is necessary. This is the position the township's been advocating from the very beginning. So, for you to prevail, you have to argue that the jury verdict was erroneous, that the detective did not act in bad faith, and your client should not have to, therefore, the township should not have to indemnify the detective. Now, you have to establish that the jury verdict was erroneous in that regard. The jury heard all these arguments at trial. How are we to be persuaded that the jury verdict was not properly based on the evidence that was before it, that the detective may have mismanaged the photo identification, photo lineup, and may have made other mistakes, but he was acting within the scope of his duties and was not proceeding in bad faith? To substitute our judgment for that of the jury, I know you complain about the jury instructions as well, but how are you going to persuade us to set aside the jury verdict in that regard? I'll acknowledge that's an uphill climb, but we believe that the evidence that was presented to this jury was such that Mr. Moore's actions could not reasonably be interpreted as having been within the scope of his employment or within good faith. He lied to the grand jury. He acknowledged that he was making conscious choices. These were not merely reckless behaviors. This was intentional behavior. And in those instances, under federal civil rights law, you can never have those kinds of actions or take those kinds of actions and have them be considered to be done in good faith. That's the law of this circuit. And so in our estimation, Your Honor— Now, what actions are you referring to at this point? Yes, Your Honor. There were several instances in which the photo identification procedure that Mr. Moore undertook involved manipulation of Mr. Gillespie's photo so that it stood out in certain respects from other of the photos that were in the lineup. That was one error. He made misrepresentations with regard to certain of the exculpatory evidence. He withheld certain of that exculpatory evidence. These were not reckless actions on his part. He really—there was a police report that was not turned over to the prosecution which would have identified the fact that Mr. Gillespie had not been identified or had been investigated by prior police detectives and determined not to have been the person responsible or not a person of interest, if you will. All of this information that was presented to the jury should have led them to the conclusion that these were not the behaviors of a reasonable police officer but someone who was acting with a different animus than a regular and typical police officer would in those circumstances. And we believe the evidence was such that it demonstrated that many of these behaviors were not being undertaken in good faith. All right. Mr. Cox, you also argue that the $45 million judgment is excessive. Could you address that argument? I can, Your Honor. It's a big number, certainly. And for Miami Township to stand in the shoes of Mr. Moore, if it is required to provide this indemnity, really defeats the purpose of the Political Subdivision Tort Liability Act in Ohio, which is to protect the interests not only of the township but of all of its residents, providing public safety considerations, providing for the public peace, and so forth. That $45 million judgment, I understand, is the largest civil rights judgment in the state of Ohio. It far exceeds the amount that this court examined in the Wheat case, which had three different defendants who were exonerees, who served a significant amount of time for murder. They were exonerated. I think the ultimate outcome there was $15 million split between three of the exonerees. So this is an extraordinary number and one that really defeats the purpose of the Political Subdivision Act. Did you argue an alternative number in front of the jury? Your Honor, I was not trying to counsel. I mean, your client. Yes, yes. I do not believe that they argued a particular number. What would be a reasonable number for over two decades of wrongful imprisonment? I mean, that's a very difficult question, Your Honor, and I don't have a number in mind. Well, how are we supposed to come up with a number then? If you don't have a number, how are we supposed to reverse the jury verdict and come up with a number? I would tell you that the $45 million number is nine times the amount that one of the exonerees in the Wheat case would have been provided, $5 million. So you're saying the Wheat case is a standard to look at? Certainly one of them. There was an article provided in the briefing by Mr. Cohen, Professor Cohen, who looked at these across the board. And both sides have argued the Cohen article for various points, certainly. But the numbers that have been typical in these type of wrongful imprisonment cases have been much more typically in the lower $1 million to $5 million range per exoneree as opposed to the number in this case. I notice that this case has never gone to a mediation conference. And often when we have a case of potentially huge damages, that we'll often refer it to the mediation office. Do you think there might be any benefit in doing that in this case? We have not had a conversation with opposing counsel about what that kind of number might look like. I do know that we have received a demand for attorneys' fees. That motion is being held in advance by the district court for the time being. We've also raised constitutional questions as well. My question is a potential referral to our mediation office. Do you think there might be any benefit to that or not? You know, Judge, I never reject the notion that we ought to try to do that. It seemed to us, though, at the time that we were in contact with the mediator's office, that between the $45 million judgment and the demand for attorneys' fees, the numbers were so far afield from what we could even possibly consider, that it was not worth the time. Is that still your position now or not? You know, if it's the court's belief that that would be productive, we would certainly object to that. Oh, okay. You wouldn't object anyway. That's correct. All right. That's basically all I wanted to know. Following up on Judge Griffin's question, can you tell us a little bit about Miami Township? I'm not from Ohio. I'd like to know something about the size and the properties of the entity we're talking about. I think it might – it would certainly come into play if you did do mediation. Yes. Thank you, Judge. There's actually multiple Miami Townships in Ohio. The Miami Township in this case is in Montgomery County, Ohio, Dayton being the county seat. There's about 50,000 residents, maybe slightly more than that, in Miami Township. It is basically along the southern tier, southern border of the county. It touches on places like Kettering and Centerville. It's a very suburban area. There's a large mall, the Dayton Mall, that is located there. It's a very residential area. There have been some large corporate presences there. LexisNexis was located there, although they've shrunk considerably from the heydays of the 1980s and 90s. But it's largely a suburban area. Thank you. You're welcome. I believe I'm out of time, Your Honors. We had some adjustment of time at the beginning. Well, I guess another question. You've made a motion for us to certify seven questions to the Ohio Supreme Court. My main problem with that is that there was no motion to certify prior to losing this case. I think I've written that certification to a state supreme court is more appropriate before a party loses, and that after you lose, that this is not the time to do it. I mean, how do you respond to that? You know, Judge, I believe that the opportunity to move to certify the questions was made timely. There was some question raised with regard to the timeliness of us raising the constitutional issue in the first place, and the district court suggested we should have done so at the time of filing the declaratory judgment action, which was actually a couple of months before trial. And in our estimation, that would have been the improper time to file, because at that point there were not ripe constitutional issues that would have been anticipatory, because we didn't know that at that point in time that Miami Township was going to have to defend or indemnify because we believed in good faith that there was not good faith on the part of Mr. Moore. So the timeliness for raising that constitutional issue did not arise until after the post-trial briefs when it was evident that the court was ordering us to indemnify Mr. Moore to the full amount of the judgment. That doesn't seem to be a good argument, because there is some case authority that you should have—constitutional challenge should be brought in the initial complaint, which you didn't do. So that argument, if there's any value to that, then the argument you're making now just wouldn't hold up, in terms of timeliness. Federal Rule Civil Procedure 5.1 allows you to make a constitutional challenge in a pleading, a motion, or other paper. We made it in our opening brief, which was the opening brief that the district court ordered us to make on the declaratory judgment action. So it's correct that we did not make that argument in the declaratory judgment complaint that we were ordered to make in October of 2022. Trial occurred in December of 2022, and it was not until after that point in time that the constitutional infirmity issue was ripe. Well, you put it in your brief down the road. You just didn't timely plead it. Well, we believe we did timely plead it, because—well, it wasn't pleaded, but it was made by motion, which is permissible under the federal rule. All right. Thank you. Thank you, Your Honors. We'll hear from your opponent, Stafford Lee. Good morning, Your Honors. Good morning. John McLandridge. I represent former Detective Moore in this litigation. So with respect to Detective Moore, we are one of the appellees with respect to the township's appeal, and we also have our own cross appeal on behalf of Mr. Moore. Spend the bulk of my limited time with respect to this indemnification issue. The rule that the township is arguing for would really amount to an absolute rule that a municipality in Ohio would never have to indemnify their employee in a Brady claim. The nature of a Brady claim under Muldown is that exculpatory evidence was withheld, or in this case, we also have the allegation that the photo array was unduly suggested. I don't think that the evidence in this case, and certainly Muldown does not require any sort of bad faith conduct on behalf of this detective, and I don't think this detective engaged in any bad faith behavior. And this piece goes a little bit to our cross appeal. When you look at the photo array and the allegation that this photo array was overly suggestive, there's a number of small attributes to the photo array that became the focus of this allegation that it was overly suggestive. That the picture of Moore's head was a little bit larger than the picture of the head of the other people in the array, or that the color of the background was a little bit different, things like that. And with respect to our jury instruction, we had requested the court to instruct the jury that cases have come up to the circuit, and I think one was a district court case, but a number of cases have come up to the circuit on these kinds of issues where the court has said, well, the fact that the alleged perpetrator is dressed a little differently, or that they're a little bit more in the foreground, or that the color of the background of their photo is a little bit different, those things don't in and of themselves make that photo array overly suggestive. We asked the district court to instruct in that fashion, and the district court declined. We think the court should have instructed the jury that those sorts of small differentials in the photos in the array did not make the photo array in and of itself overly suggestive. Juries still would have been free to disagree and find that, as plaintiff argues, the culmination of all those things, the combination of all those things, made the photo array overly suggestive. But to not instruct the jury in that fashion we think was prejudicial. But going back to the indemnity piece, the fact that there's these little differentials in the photos, in the array, is not indicative of some piece of bad faith, lack of good faith, vis-a-vis the indemnity statute on behalf of Detective Moore. It's certainly not conduct that's outside the course and scope of his employment. His employment includes doing his job as a detective, preparing this photo array and presenting it. The way things were done in 1990 is not the way things are done today, and frankly that's one of the difficulties in a case like this. It's very hard to separate the current state of the art from the state of the art in 1990 when these events occurred. In any event, I don't think there's any of that that's at all indicative of Detective Moore acting outside the course and scope or in bad faith. The same thing with respect to this issue of the alleged exculpatory evidence. So the one main feature of that argument was that there was a report prepared by Detective, well, Sergeant Fritz, and I'm sorry, I'm forgetting the other fellow's name, but this prior detective had prepared this report that supposedly, in his view, excluded Mr. Gillespie as a viable defendant. When Detective Moore is given the file, there's no evidence that he ever received that report. The testimony, which the detective didn't even testify at trial, the sergeant did, he said, well, this other detective prepared this report, it was in the file when I left the department. Well, that's fine, but there was no evidence that it was in the file when Detective Moore received it. Now, that's an inference that was apparently drawn, that that report continued to be in the file, notwithstanding the fact that that sergeant who left the department became the investigator for the criminal defense attorney in that case, which I found astounding. But that said, there's no evidence that he... Excuse me. Yes, please. Was there affirmative evidence that it was not in the file? There was no affirmative evidence either way. Okay, thank you. You're welcome. And so the same thing with respect to this issue of the campground receipts. Detective Moore says he only ever received three receipts at grand jury, and he says, well, he lied at grand jury. As we all know, grand jury testimony isn't the foundation for liability. That's immune conduct. The Supreme Court has told us that. But that aside, he said, well, I had several months of receipts. And so plaintiffs counsel, you know, they're good lawyers, right? Well, here you're saying you have months of receipts. Here you're saying you only have three receipts. Those three receipts covered three different months, so it's not really necessarily an inconsistent statement. But what we don't know in terms of what the jury found was did they find that this report was suppressed or did they find that it was the withholding of the campground receipts? There was no jury interrogatory on that. All we know, and quite frankly in these cases, you go into it as the defendant with the finding that a federal court has already ruled that this person is a wrongfully convicted individual, a state court. Federal court gave him a habeas. State court then finds he's a wrongfully convicted person. The jury, quite frankly, in my view, is backing into the finding that he suppressed exculpatory evidence or that the photo array was unduly suggestive because, in their mind, they've already got a person who's been deemed to be wrongfully convicted, and now they're just looking to provide a reason to attach it to, right? The purpose of this statute at state law is to not only protect the political subdivision, that Chapter 2744 of the Ohio Revised Code, but this specific subsection we're talking about is to protect the employee who's doing his job from the ruinous judgment, right? Not just in this case, but in any case, should a judgment come down. They want to walk away from that obligation, and their argument is, well, if Detective Moore pays some money, we'll pay him back, right? But putting aside $45 million, even if this was a $2 million judgment, this detective's got his pension and a house that his wife owns from a prior marriage, right? So he's going to have to go bankrupt. They wouldn't require your client to declare bankruptcy, would they not? Well, frankly, if there was no indemnity and somebody was trying to collect against him, he probably would declare bankruptcy, except he's not collectible, so nobody's trying to collect from him. But the idea that all the money should be sucked out of the employee, and then he could get paid back by the entity after the fact, to me, is not the way the statute's intended to work and is not an appropriate structure, particularly when the statute indicates the employee's to be indemnified and held harmless. Well, so what, we're going to ruin him by making him destitute, but then we'll give him the money back once he's destitute. I don't think that's the intention of the statute. I'm out of time, and I would ask the court to reverse. Thank you. All right. Good morning. Good morning, Your Honors, and may it please the Court. David B. Owens with Mike Kanovitz, my colleague for Dean Gillespie, who's here with us in the gallery. Dean is here again, still in pursuit of vindication for having spent the last 35 years-plus fighting for the stain and harm of wrongful conviction. That harm has continued for his entire adult life and will continue for decades in the future. The jury below recognized that Dean Gillespie proved Moore violated his constitutional rights via unreliable identification procedures and by suppressing favorable evidence. The jury correctly recognized that Gillespie will suffer and continue to suffer harm. The jury also had a unique opportunity to evaluate Detective Moore's credibility, his mental state, his mens rea, all of those things, and it found that Moore did not act in bad faith and he acted within the scope of his employment. The law, therefore, requires Miami Township to satisfy that judgment. So those decisions from trial and post-trial should stand. However, we do take issue in our appeal here with the Court's decision to grant summary judgment to Miami Township on Mr. Gillespie's Monell claim. A reasonable jury can find that Miami Township's absence of training and policies harmed Gillespie. Here, construed in plaintiff's favor, the evidence indicates that Miami Township had no written policies concerning the production of Brady material or identification procedures. You know, even if your argument is well taken in that regard, in terms of damages, you don't think your client could get much more than $4 or $5 million even if you prevailed on the Monell claim and the case went back for further proceedings, do you? Correct, Your Honor. The damages figure wouldn't change. The jury, and in fact, this jury was specifically instructed on double recovery, which is another reason the challenges to the verdict amount are sort of don't stand. But there is, I think, some practical import to the impact of a Monell claim, at least in two senses. One is the judgment itself would be against the municipality, which would sort of make this big fight about indemnification possibly less significant. And secondarily, the Supreme Court has recognized the importance of deterrence when it comes to Section 1983 and the importance of serving a public function, and that's part of what Monell is also doing. There's also some, so I do agree, Your Honor, though it wouldn't change the damages figure, it wouldn't change how much Mr. Gillespie has personally suffered, it could change some other things on the ground, and he does have a right to seek vindication against the township. I apologize, Your Honor. Well, I mean, the issue that I'm mainly concerned about is just the amount of the damages. I know Mr. Gillespie has suffered terribly for over 20 years of wrongful imprisonment, but what is a reasonable amount of damages under the circumstances? I know, I'm not sure if you were the trial attorney or somebody else was, I know that you asked for $60 million and the jury came back with $45 million. You say, well, that's reasonable. What if the jury, what if you'd asked for $145 million and the jury came back? Would that have been reasonable? So I think that the question that Your Honor asked earlier about how are we supposed to sit here and say. . . Sure, and we are supposed to assess whether the amount of damages are reasonable and how we put a figure out, I really don't know, but that's why I'm asking you. Absolutely. So I do think that it depends first on the evidence that was adduced in this particular case because not every single plaintiff is the same. Mr. Gillespie is himself extraordinary. There was extensive damages testimony in this particular case about his own suffering. There was medical diagnosis about PTSD, which is not going to be present in every case. The nature of the crime that he was wrongfully convicted of, being a sexual assault, impacted his time in prison and his time subsequent. And I think that this is part of the frame by which you evaluate the damages in this case. It's not just the nearly 21 years that Mr. Gillespie spent in prison that he's getting damages for. It is the entire course of his lifetime. So if you start with 21 years, and it was 20 years and 11 months and 17 days, continuously confined, add 14 days to that in pretrial, and so you're at almost 21 years. But then there's five and a half more years on parole where his liberty was restrained. He testified about the significance of being labeled a sex offender, which wasn't eliminated until 10 years after he was released from prison. Then you have the life that he's lived now and subsequent into the future. So if you confine it to just 20 years and say this is the per figure, it doesn't really work. The jury here was instructed to evaluate what he had suffered in the past and what he had looked at in the future. And I actually think that Judge Rose, who didn't commit an abuse of discretion here, had an interesting footnote on this point. Because if you calculated the damages at a per day figure and asked for the number of per days, the amount would have been like $380 million or something. Okay, would that have been reasonable? I think that it would have been pretty astronomical. Okay, how do we draw the line? I guess I'm asking you, you just admitted $349 million would have been too much. All right, how do you determine that and how do we determine whether this is too much? Sure. I think that the answer in the law, Your Honor, is that this court's review is doubly deferential. It's deferential to the jury's treatment of that based upon the facts that it considered. And in this posture, this court's review is for an abuse of discretion. Judge Rose sits there as a backstrop to this because the review is itself limited. And though they are not determinative, I do think that courts can, sort of in the backstrop, consider other verdicts in comparable cases. This is the highest verdict in Ohio for a civil rights case. This is the highest. By far. So if we compare it to other verdicts, we'd have to reduce it, would we not? You wouldn't because it's about the effective role. So this is, again, where the limited role of comparison, because the role of comparison is just seeing if it's so, so, so excessively out of the bounds for what has occurred in other cases, and this is where things get difficult. We've looked at other wrongful conviction cases, and there are comparable verdicts. We pointed out there was a $50 million verdict in Chicago earlier this summer. There was a $34 million verdict for someone who spent less time than Mr. Gillespie, like 15 or 16 years, in Las Vegas in December. I tried that case. So if you're looking at the other verdicts and if you want to go into the formula of, like, per year of incarceration, Mr. Gillespie's case is not an outlier as far as those verdicts go. So if you have Mr. Gillespie's case is not an outlier in terms of those other verdicts and then you supply that the review here is for an abuse of discretion and then you supply that the jury here had latitude and the court presumes that juries follow the instructions that are given and this particular jury was instructed to not only consider the time that he had spent, and this is the main thing. So say Mr. Gillespie goes on to live for another 20 years from now and the overall damages that he has suffered to this wrongful conviction encompass 60 years, 50 years. That's what's also going into account here. It's not just the 21 years that he spent in prison added to the other years. And so I think that that's a way of looking at the particular evidence that occurred in this case as it relates to Mr. Gillespie, especially given this court's limited review. And I do want to say that my opponent from Miami Township, he mentioned this study by Professor Cohen and Mr. Moore relied upon it as well. Professor Cohen there provides the economic analysis about Mr. Gillespie's verdict in this particular case, if you analyze it in those ways, not even being in the 90th percentile. And so he's looked at all of those things and we're not there. Turning back to the issue, I think- I imagine if you're-I don't want to speak for your client, but I imagine if your client had to choose between the 24 years in prison and $45 million, he'd likely take the not having spent 24 years in prison rather than the $45 million. I think that's absolutely right. I think that the testimony is not even $100 million would make up for it. And part of the thing here, part of our resistance to the idea of a per year calculation is because it covers all of this future harm. In addition, there's a particular terror that happens when you're wrongfully convicted and you don't know if and when you'll ever be allowed to leave the prison. And you have to-it's a trauma that continues and continues. So I do think that the question here for this particular court is doubly deferential as to the trial court who heard all of the evidence and the evidence in this case, which is particularly unique. And so the other thing that's come up sort of somewhat significantly as it relates to damages is lost opportunity at life. So no family, no children, people who have passed away or passed away soon after. You don't get that time back. Two witnesses who testified at this trial about Mr. Gillespie's damages have passed away now, just two years later. Mr. Gillespie, the time that he missed with his dad fishing, doing things that he liked to do with his family, he'll never get it back. The time that Mr. Gillespie lost with one of his best friends, Jerry Fife, who was a pastor who testified at trial pretty magnanimously, he'll never get that back. Those are the types of things that are included here and were supported by the testimony at trial. I wanted to address just very briefly, Your Honor, a couple of the issues that the township brought up, because the township's arguments are not considering the evidence in the proper light. The jury, as we know, it's the jury's province to evaluate credibility and to evaluate the mens rea of a witness. And I think the important thing here is that the township could have sat this trial out. Our Moneau claim had been dismissed. The township asked to participate in this trial and moved to intervene for the purpose of asking the jury these particular questions about whether it was in the scope of employment or not in good faith. They asked for that. We objected. And the court said, yep, you're going to be allowed to do that. The reason for doing it was to ask these questions. Now, if a jury verdict in Gillespie's favor on our claims somehow meant automatically there would be no indemnification, there would be absolutely no reason to present these questions to the jury. But the township chose to do that. We went back and forth with different jury instructions and submitted these issues of mens rea, quintessential jury questions here. And so the township's argument, I think that this court should hold them to their representation. Putting aside whether or not their constitutional challenge was timely, their constitutional challenge is frivolous. The township should be held to its own representation where the township argued below the plain language of the statute is unambiguous. To turn around and then say not only is it ambiguous but it's so ambiguous that it's constitutionally vague is kind of difficult to assume. Also, the township argued below that the statute would require it to pay any amount of a qualifying judgment. That tracks the language of 2744, which specifically says the political subdivision shall indemnify and hold harmless an employee in the amount of any judgment. So the statute itself, which the township said was clear below, is in fact clear. Its challenges are really about the sufficiency of the evidence. That was for the jury to weigh. Moore was inconsistent in his grand jury testimony and how he testified at trial. That's impeachment evidence under Brady. We did not argue that Moore lied and committed perjury and did all of this other stuff. That's not what the testimony was. And more importantly, the jury was not required to accept that version of it. Moore at this trial testified he sincerely believed that Gillespie was guilty. Even at the trial, 20 years later. Moore testified that he believed that the identification procedure didn't single Gillespie out. Moore testified that he was acting in service of the victims of a crime. So Moore had those views in his heart and in his mind. And the jury was entitled to find that he made knowing or reckless mistakes as they were instructed. This court presumes juries follow their instructions. There's no challenge to the jury instructions here. And the township's argument about Moldawan requires stacking sort of inference upon inference about federal law and applying it to a separate statute. The jury was properly instructed that that separate question had nothing to do with Gillespie's claims. But even if we were to entertain this sort of Moldawan argument for the sake of argument first, it doesn't pertain to the identification claim, which itself sustains the verdict, and therefore the indemnity obligation for the entire amount, which is why we couldn't get Moore again. But even then, the jury was instructed that reckless conduct is still in good faith. That jury instruction is unchallenged. And so the jury verdict here is consistent. There's no basis for attacking it here. And I've exceeded my time. Thank you. One other question. I asked the township if there would be any value at all of sending the case to our mediation office. I noticed that you never had a mediation conference, which I was kind of surprised to find out, because usually a case with large verdict like this automatically goes to the office. Would there be any benefit at all to sending this to the mediation office to explore the possibility of mediation? I was also surprised, Your Honor, that we didn't get sort of the auto mediation thing. And it may be because we're back on the second appeal, because the interlocutory appeal, there was some of that process happened as a result of that. As to whether it would be a valuable use of our time to go to mediation, that is a question for them. They said they wouldn't object, and I think they're amenable to it. I'm asking whether Gillespie would be. The question is how much money they want to offer us. Well, you might find out in mediation. We wouldn't object to a mediation. All right. Very good. Thank you. Their argument is that there's nothing inconsistent with the jury finding that the Detective Moore acted recklessly in withholding evidence and in the photo array, and that acting reckless is not necessarily the same thing as acting in bad faith. I mean, is that incorrect? I think there's a distinction between reckless behavior and intentional behavior, yes. No, bad faith behavior, because the indemnity statute doesn't provide for indemnity if it's in bad faith, but it does provide if the conduct was reckless, right? Correct. It's a question. So, I mean, that can happen, right? You just say it did not happen here? That's correct. Okay. The long and the short of it is that if the indemnity statute applies, if we're not available, if the exception under 274407B is not available because the court rules that he did act in good faith and that he acted with and or within the scope of his employment, if we're stuck with that indemnity obligation, we have a lot of questions about how and to what amount and what process there is because the statute is silent on that point. It also requires us – But you would have him declare bankruptcy, would you not, and just reimburse him whatever he has left after bankruptcy? Is that how you would interpret the statute? Well, I'm not sure how we would interpret the statute other than to say the township wasn't the tortfeasor here. No, but the indemnity statute, you say that if a statute applied, you would only be responsible to indemnify him for what he actually pays out of his own pocket. Well, Moore is not going to pay $45 million. Correct. So, I mean, what he would do is declare bankruptcy, I assume, and that's how you would have all state employees act whenever they have a judgment against them, I guess? You know, all I can do is look to what the Ohio Supreme Court did in Ayers, which is to say that the right of indemnification is personal to the employee. It is not a right that belongs to a third-party judgment creditor. So the obligation under the statute and under the Ohio Supreme Court's interpretation in 2020 in Ayers, we believe it's instructive. If the township must indemnify Moore, then limiting the amount of the indemnity to the amount that Moore can pay, in this case, he probably can't pay very much, is still consistent with Ayers. It fulfills the stated purpose of the statute. It respects federal law regarding not imposing vicarious respondeat superior liability on the township, and it strictly limits the liability that the political subdivision would have to pay in this 1983 action. How are you ever going to get anybody to be a police officer or a detective if they are not indemnified by the government? Are people really going to assume this type of liability to lose everything they've got, lose their house, lose their car, lose their pension, their savings and stuff? I mean, how are you ever going to get anybody to do these kind of jobs, if your interpretation is correct? The solution there is that they do them in good faith and within the scope of their responsibilities. Well, okay. I mean, he took an oath. He promised to do what he was supposed to do. The jury found he actually acted in good faith, but he just acted recklessly, that he violated Gillespie's civil rights by his actions that were reckless, even if they were intentional. But he did not do them in bad faith, which means he didn't intend to violate his civil rights. He just intended to do the act. We would certainly acknowledge that the jury concluded that he knowingly or recklessly violated the constitutional rights. That was the answer to that. But in bad faith. Thank you, Your Honors. Thank you. And the case is submitted.